UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-22076-CIV-ALTONAGA/Reid

YOLANDA LOPEZ,

       Plaintiff,

v.

CITY OF OPA-LOCKA, *et al*.,

       Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on Defendant, City of Opa-Locka's (the "City['s]")
Motion for Summary Judgment [ECF No. 73]; and Defendants, Johane Taylor and Gabriela
Llanes's (the "Officers[']") Motion for Summary Judgment [ECF No. 77]. Plaintiff, Yolanda
Lopez filed respective Responses [ECF Nos. 91, 93] to the Motions, to which the City and the
Officers filed their respective Replies [ECF Nos. 102, 110]. The Court has carefully considered
the record, the parties' written submissions, and applicable law.[1] For the reasons that follow, the
Motions are denied.

## I. BACKGROUND

This civil rights action arises from Plaintiff's October 1, 2022 arrest outside the Opa-Locka
Flea Market (the "Market"), a longstanding community fixture that shuttered just one day earlier

---

[1] The parties' factual submissions include the City's Statement of Undisputed Material Facts ("City's SOF")
[ECF No. 74]; the Officers' Statement of Undisputed Material Facts ("Officers' SOF") [ECF No. 76];
Plaintiff's Response to the City's Statement of Facts ("Pl.'s Resp. City's SOF") [ECF No. 90]; Plaintiff's
Response to the Officers' Statement of Facts and Statement of Additional Facts ("Pl.'s Resp. Officers'
SOF") [ECF No. 92]; the City's Reply Statement of Facts ("City's Reply SOF") [ECF No. 103]; and the
Officers' Reply Statement of Undisputed Material Facts ("Officers' Reply SOF") [ECF No. 109]. "[T]o
the extent applicable[,]" the City's Statement of Facts adopts and incorporates the Officers' Statement of
Facts. (City's SOF 1 n.1 (alterations added)).

after decades of operation.  (*See* Second Amended Complaint ("SAC") [ECF No. 43] 1–2;[2] Officers' SOF ¶¶ 1, 4–6; Pl.'s Resp. Officers' SOF ¶¶ 1, 4 (disputed on other grounds), 5, 6 (disputed on other grounds)).  For years, Plaintiff and her husband ran a small electronics business inside the Market, but the Market's closure forced them — as well as other vendors — to vacate the premises with just one week's notice.  (*See* Officers' SOF ¶¶ 3–5; Pl.'s Resp. Officers' SOF ¶¶ 3, 4 (disputed on other grounds), 5).  Plaintiff soon reopened her business at a storefront one block away and, along with the other displaced vendors, returned to the sidewalk outside the recently closed Market to hand out flyers informing passersby of their businesses' new locations. (*See* Officers' SOF ¶¶ 4, 6; Pl.'s Resp. Officers' SOF ¶¶ 4 (disputed on other grounds), 6 (disputed as characterized)).

On the morning of the incident, City of Opa-Locka Police Department ("OLPD") sergeant Taylor was on duty patrolling the area around the Market when he observed several individuals stopping traffic and handing out flyers on NW 42nd Avenue, the main roadway fronting the property.  (*See* Officers' SOF ¶ 25; Pl.'s Resp. Officers' SOF ¶ 25).  Taylor advised the group that the Market was closed, and they could not safely solicit customers near the street.  (*See* Officers' SOF ¶ 25; Pl.'s Resp. Officers' SOF ¶ 25).  Everyone who Taylor spoke to complied with his instructions and dispersed without incident, and he left the area to continue his regular patrol.  (*See* City's SOF ¶¶ 17–18; Pl.'s Resp. City's SOF ¶¶ 17, 18 (disputed on other grounds); Officers' SOF ¶ 6; Pl.'s Resp. Officers' SOF ¶ 6 (disputed on other grounds)).[3]

---

[2] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.  Citations to deposition testimony rely on the pagination and line numbering in the original document.

[3] Defendants maintain that after Taylor left the group he encountered, he resumed routine patrol and only returned to the scene after overhearing a heated exchange between Opa-Locka police sergeant Llanes and Plaintiff during a phone call with Llanes.  (*See* City's SOF ¶¶ 18–19; Officers' SOF ¶¶ 25–27).  Plaintiff disputes that account, claiming Taylor never left the area but instead remained close enough to observe Llanes's initial interactions with Plaintiff and the other vendors.  (*See, e.g.*, Pl.'s Resp. Officers' SOF ¶ 16).

Llanes — another OLPD sergeant — was also in the area, stationed nearby as part of an off-duty security detail at the Market to prevent theft of any leftover merchandise. (*See* Officers' SOF ¶¶ 2, 7; Pl.'s Resp. Officers' SOF ¶¶ 2, 7). While on post, Llanes observed Plaintiff standing near the Market's gated entrance and claims that Plaintiff was stopping vehicles in the roadway to distribute flyers about her family's business. (*See* Officers' SOF ¶¶ 6, 8–10).

The parties sharply disagree as to what occurred next. According to the City, Llanes initially advised Plaintiff over her patrol car's loudspeaker to leave the area and find a safer place to continue her activity, but Plaintiff refused to comply with the order. (*See* City's SOF ¶ 4). Llanes purportedly then parked her patrol car near the Market's entrance, approached Plaintiff on foot, and repeated the same command approximately ten times, instructing Plaintiff to move to a different location where she would not obstruct traffic. (*See id.* ¶ 5). The City contends that Plaintiff stepped toward Llanes, entering what it describes as Llanes's "safety zone[,]" prompting Llanes to give additional commands in an effort to defuse the situation. (*Id.* ¶ 6 (alteration added)). Llanes also directed Plaintiff to move her car, which was parked on the sidewalk. (*See* Officers' SOF ¶¶ 12–13; Pl.'s Resp. Officers' SOF ¶¶ 12–13 (disputed on other grounds)).[4]

The City further asserts that after Llanes issued yet another command to leave, Plaintiff began shouting, "[t]his is not Opa-Locka[,] this is my country!" — drawing the attention of pedestrians and motorists who stopped or slowed down to watch. (City's SOF ¶ 8 (alterations added; quotation marks omitted)). Before tensions escalated any further, Plaintiff and the other vendors moved their vehicles to a more suitable location across the street, following Llanes's directive. (*See id.* ¶ 9; Pl.'s Resp. City's SOF ¶ 9 (disputed on other grounds); Officers' SOF ¶¶

---

[4] Plaintiff insists the *only* instruction Llanes gave was to move her car — a command Plaintiff says she followed promptly once Llanes moved the patrol vehicle blocking Plaintiff's car. (*See* Pl.'s Resp. Officers' Mot. 8).

12–13; Pl.'s Resp. Officers' SOF ¶¶ 12–13 (disputed on other grounds)).

According to Defendants, the vendors soon returned to the sidewalk, and Plaintiff resumed engaging with passing drivers, leading Llanes to again conclude Plaintiff was obstructing traffic and posing a safety risk. (*See* City's SOF ¶ 9; Officers' SOF ¶¶ 14, 16). Defendants assert Plaintiff continued this activity for another 20 to 25 minutes, worsening traffic congestion, before Llanes once more ordered her to leave. (*See* City's SOF ¶ 9; *see also* Officers' SOF ¶¶ 13–16).

Plaintiff offers a markedly different account. She insists that after the group returned to the sidewalk, Llanes began yelling that she did not want to see any vendors near the Market. (*See* Pl.'s Resp. Officers' SOF ¶ 16). Plaintiff says she tried to explain the vendors were not doing anything illegal and were simply letting customers know where their businesses had relocated to, but Llanes became "heated, angry, and very aggressive." (*Id.* (quotation marks omitted)).

Plaintiff denies obstructing traffic or breaking any laws. (*See id.* ¶¶ 6, 8–10, 13). She maintains that she stood on a public sidewalk and engaged only with confused patrons who voluntarily pulled over near the Market's entrance. (*See id.* ¶¶ 6, 9). To the extent traffic slowed, Plaintiff attributes the cause not to her own conduct, but to a posted sign beside her that was advertising the Market's new location, as well as to vehicles attempting to access the now-closed Market gates. These actions forced drivers to stop, turn around, or reverse into the street, sometimes causing congestion along the curb. (*See* Pl.'s Resp. Officers' Mot. 12; Pl.'s Notice of Filing Exs. ("Notice") [ECF No. 89], Ex. 4, Pl.'s Decl. ("Pl.'s Decl.") [ECF No. 89-4] 5).

As the exchange with Llanes escalated, Plaintiff called her husband to tell him she did not believe she could continue handing out flyers. (*See* Officers' SOF ¶ 18; Pl.'s Resp. Officers' SOF ¶ 18 (disputed on other grounds)). Plaintiff states that during that time, Llanes's demeanor became more threatening, leading Plaintiff to step away from the other vendors and place a second call — this time to 911 — to report the encounter. (*See* Pl.'s Resp. Officers' SOF ¶¶ 16, 24).

4

As Plaintiff spoke with a 911 operator, Llanes received a dispatch call about a woman matching Plaintiff's description who was handing out flyers, refusing to leave, and impeding traffic.  (*See* City's SOF ¶ 10; Pl.'s Resp. City's SOF ¶ 10).  Llanes then got into her patrol car, activated her emergency lights, and pulled up near Plaintiff — who remained on the call with 911. (*See* Officers' SOF ¶ 22; Pl.'s Resp. Officers' SOF ¶ 22 (disputed on other grounds); *see also* Notice, Ex. 8, USB Thumb Drive [ECF No. 89-3], Civilian-Recorded Video ("Arrest Video") 0:01–0:16).

According to Defendants, Llanes approached Plaintiff with the intent to place her under arrest, believing she had probable cause to do so based on Plaintiff's continued obstruction of traffic and refusal to comply with prior commands.  (*See* Officers' SOF ¶ 23).  Defendants state that as Llanes attempted to handcuff Plaintiff, she managed to secure only the left wrist before Plaintiff allegedly tensed her right arm and pulled away.  (*See id.* ¶ 24).  Moments later, Taylor arrived on scene and stepped out of his patrol car to assist Llanes with the arrest.  (*See* City's SOF ¶ 20; Pl.'s Resp. City's SOF ¶ 20 (disputed on other grounds); *see also* Arrest Video 0:26–0:34).

On Defendants' telling, the Officers tried to lean Plaintiff — who weighed approximately 300 pounds — against the hood of Taylor's patrol car to secure her arms.  (*See* Officers' SOF ¶¶ 30, 33).  They claim her body weight and physical resistance made it difficult to complete the arrest, particularly given Llanes's smaller frame at five-foot-three and 165 pounds.  (*See id.*).[5]  The

---

[5] Plaintiff appears to have inadvertently included an extra paragraph in her Response to the City's Statement of Facts and again in her Response to the Officers' Statement of Facts — at paragraphs 29 and 32, respectively — causing the rest of the paragraphs to be misnumbered.  (*See* Pl.'s Resp. City's SOF ¶ 29; Pl.'s Resp. Officers' SOF ¶ 32).  What is labeled as paragraph 30 in the Response to the City's Statement of Facts should be 29, 31 should be 30, and so on; and what is labeled as paragraph 33 in the Response to the Officers' Statement of Facts should be 32, 34 should be 33, and so on.  (*Compare* City's SOF ¶¶ 29–30, *with* Pl.'s Resp. City's SOF ¶¶ 30–31; *compare also* Officers' SOF ¶¶ 32–33, *with* Pl.'s Resp. Officers' SOF ¶¶ 33–34).  To avoid confusion, the Court preserves the numbering used in Plaintiff's Responses but matches each paragraph to the appropriate statement in either the City's or the Officers' Statement of Facts.

Officers say that not long after, Llanes warned Plaintiff to stop resisting and then applied a taser to the middle of her back to gain compliance.  (*See id.* ¶¶ 30–31).

According to Defendants, even after Plaintiff collapsed on the ground, she continued to resist arrest.  (*See id.* ¶ 35).  They claim she tensed her body and thwarted their attempts to handcuff her, prompting Llanes to deliver a second drive stun to Plaintiff's lower back.  (*See id.* ¶¶ 35–36).  Only after this second stun were the Officers able to finish handcuffing Plaintiff without further use of force.  (*See id.* ¶ 37; Pl.'s Resp. Officers' SOF ¶ 38).

In contrast, Plaintiff asserts that she was no longer handing out flyers when Llanes returned but was instead standing on the sidewalk calling 911 to report police harassment.  (*See* Pl.'s Resp. Officers' SOF ¶¶ 21, 24).  According to Plaintiff, Llanes approached aggressively, struck the phone from her hand, and initiated an arrest without cause.  (*See id.* ¶¶ 24, 29).  While she was still on the line with a 911 dispatcher, Plaintiff recalls being told to inform the officer about the call — to which Llanes allegedly snapped, "the police here is me[.]"  (*Id.* ¶ 24 (alteration added; quotation marks omitted)).  Plaintiff says she then assured Llanes she had no intention of resisting and pleaded not to be tased because of a heart condition.  (*See id.* ¶¶ 24, 29).

According to Plaintiff, she remained compliant throughout, posed no threat, and made no aggressive movements.  (*See id.* ¶¶ 24, 29, 39).  She claims that once Taylor arrived, both Officers pinned her against Taylor's patrol car and began using force unnecessarily.  (*See id.* ¶¶ 30, 34).  The first taser deployment, Plaintiff says, caused her to scream and collapse on the pavement, where she briefly lay motionless.  (*See id.* ¶ 33).  She insists Llanes then administered the second taser, while she was already face down and not resisting.  (*See id.* ¶ 36).  Although all sides agree Plaintiff never extended her hands or placed them behind her back to facilitate her arrest (*see* Officers' SOF ¶ 38; Pl.'s Resp. Officers' SOF ¶ 39), Plaintiff maintains that no one ever told her to stop resisting or informed her she was under arrest in the first place (*see* Pl.'s Resp. Officers'

SOF ¶ 29).

Plaintiff was later charged with disorderly conduct, resisting an officer without violence, and obstructing traffic. (*See* Officers' SOF ¶ 40; Pl.'s Resp. Officers' SOF ¶ 41 (disputed on other grounds)). Plaintiff asserts six claims for relief: false arrest (Count I) and excessive force (Count II) under 42 U.S.C. section 1983 against the Officers; assault and battery (Count III) and false imprisonment (Count IV) under Florida law against the Officers; and assault and battery (Count VI) and false imprisonment (Count VII) under Florida law against the City.[6] (*See* SAC ¶¶ 31–62, 82–94). The City and the Officers move for summary judgment on all claims asserted against them. (*See generally* City's Mot.; Officers' Mot.).[7]

## II. LEGAL STANDARDS

***Summary Judgment.*** Summary judgment is appropriate when the record — including the pleadings, discovery and disclosure materials, and any affidavits — reveals no *genuine* dispute of any *material* fact, and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). A fact is "material" if it might affect the outcome of the case under the governing law, and a dispute is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). In applying this standard, "the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citation omitted).

---

[6] The Court previously dismissed Counts V and VIII against the City. (*See generally* Dec. 2, 2024 Order [ECF No. 57]). In addition, Plaintiff's claims against Defendants GPT NW 42nd Avenue Owner II LLC and Link Logistics Real Estate Management LLC were dismissed with prejudice. (*See generally* Joint Stipulation of Settlement & Dismissal with Prejudice [ECF No. 107]; May 15, 2025 Order [ECF No. 111]).

[7] In her Response to the Officers' Motion, Plaintiff states the Court "could *sua sponte* grant summary judgment" in her favor. (Pl.'s Resp. Officers' Mot. 3). To the extent Plaintiff intended this statement as a cross-motion for summary judgment, it is procedurally improper. *See Dean v. 1715 Northside Drive, Inc.*, 224 F. Supp. 3d 1302, 1326 n.19 (N.D. Ga. 2016).

Where the moving party bears the burden of proof on the relevant issue at trial, it can meet its summary judgment burden only "by presenting *affirmative* evidence showing the absence of a genuine issue of material fact — that is, facts that would entitle it to a directed verdict if not controverted at trial." *Emery v. Talladega Coll.*, 169 F. Supp. 3d 1271, 1280–81 (N.D. Ala. 2016) (citation omitted; emphasis in original), *aff'd*, 688 F. App'x 727 (11th Cir. 2017). Once such a showing is made, the burden shifts: unless the non-movant counters with "significant, probative evidence" that reveals a triable issue of fact, summary judgment must follow. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted).

By contrast, where the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment either by (1) affirmatively establishing that no genuine dispute exists as to any essential element of the non-moving party's claim or (2) pointing to an absence of evidence in the record to support that element. *See Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14209-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). "Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute." *Id.* (alteration added; quotation marks omitted; quoting Fed. R. Civ. P. 56(c)(1)).

**Qualified Immunity.** Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (alteration added; quotation marks omitted; quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). At its core, this doctrine "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231

CASE NO. 24-22076-CIV-ALTONAGA/Reid

(2009).

To be entitled to qualified immunity's protections, a government official must first demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (citations and quotation marks omitted). Once that threshold is met, the burden shifts to the plaintiff to show that qualified immunity is inappropriate. *See Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted), *abrogated in part on other grounds by Pearson*, 555 U.S. 223; *see also Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (citations omitted). To defeat a qualified immunity defense, the plaintiff must establish two things: first, that the government official violated a constitutional right; and second, that the right was clearly established at the time of the alleged violation. *See Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citations omitted).

The plaintiff "bear[s] the burden of showing that the federal rights allegedly violated were clearly established." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996) (alteration added; citation omitted). To satisfy the "clearly established" requirement, a law "should not be defined 'at a high level of generality[,]'" and the "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (alteration added; citations omitted). There are three ways a plaintiff may show a right is clearly established:

> (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016) (citation and quotation marks

omitted).[8]  Even if the plaintiff demonstrates that, at a general level, a clearly established right may

be at stake, the necessary particularization requires the Court to examine "whether the defendant's

conduct was nonetheless objectively reasonable in light of that [clearly established] right."  *Rioux*

*v. City of Atlanta*, 520 F.3d 1269, 1283 (11th Cir. 2008) (alteration added; citation and quotation

marks omitted), *abrogated in part on other grounds by Pearson*, 555 U.S. 223.

When qualified immunity is raised at summary judgment, the analysis does not halt simply

because genuine issues of material fact remain.  *See Robinson v. Arrugueta*, 415 F.3d 1252, 1257

(11th Cir. 2005) (citation omitted).  As the Supreme Court has cautioned, denying summary

judgment at the first sign of a dispute would undermine qualified immunity's purpose: shielding

officials not only from liability, but from the burdens of litigation itself.  *See Saucier v. Katz*, 533

U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. 223.  Instead,

courts must view the record in the light most favorable to the plaintiff and ask whether, on that

version of the facts, the defendant violated a constitutional right; and if so, whether that right was

clearly established at the time of the violation.  *See Robinson*, 415 F.3d at 1257 (citation omitted).

In doing so, the court must set aside factual disputes and consider only the plaintiff's "best case[.]"

*Id.* (alteration added).  With this approach, genuine disputes of material fact do not control the

qualified immunity inquiry and cannot preclude the grant of summary judgment.  *See id.*

## III.  DISCUSSION

Having carefully reviewed the record, the Court concludes Defendants are not entitled to

summary judgment on any of Plaintiff's claims.  First, the parties hotly dispute the events

---

[8] In the Eleventh Circuit, only decisions from the Supreme Court, Eleventh Circuit, and the pertinent state's highest court — here, the Florida Supreme Court — can clearly establish the law for qualified immunity purposes.  *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (citation omitted).

surrounding Plaintiff's arrest, precluding summary judgment.[9]  Second under Plaintiff's best case, the Officers are not entitled to summary judgment on their qualified immunity defense to the section 1983 claims because the conduct she describes violated clearly established law.

Plaintiff's section 1983 claims (Counts I and II) are asserted only against the Officers in their individual capacities, and the state-law claims for assault and battery and false imprisonment (Counts III, IV, VI, and VII) involve both the Officers and the City.  The Court takes the section 1983 claims first and then turns to the state-law claims.[10]

### A.  <u>Section 1983 Claims</u>

Plaintiff brings two claims under 42 U.S.C. section 1983 against the Officers: false arrest (Count I) and excessive force (Count II).  (*See* SAC ¶¶ 31–49).  The Officers move for summary judgment on both, contending they had probable cause to arrest Plaintiff and used only reasonable force under the circumstances.  (*See* Officers' Mot. 3–14).  In the alternative, the Officers assert their qualified immunity defense shields them from liability.  (*See id.*).

The Court easily dispenses with the Officers' request for summary judgment on the claims themselves.  The record is replete with genuine disputes of material fact — including over the

---

[9] The Officers argue that the Arrest Video confirms their version of events and discredits Plaintiff's.  (*See* Officers' Mot. 2, 7, 10; *see also* Arrest Video).  On review, a clear contradiction is not evident.  The video — a 70-second cellphone recording captured by a bystander from across NW 42nd Avenue — provides only a short and obstructed glimpse into the incident.  The footage opens with Plaintiff visible on the sidewalk in front of the Market, followed by Llanes driving up and approaching, and Taylor arriving moments later.  (*See id.*).  It ultimately shows the Officers handcuffing Plaintiff on the ground.  (*See id.*).

For much of the recording, Taylor's vehicle partially or entirely obstructs the view, and the distant audio provides little insight into what is being said or done.  (*See id.*).  Having carefully reviewed the recording in its entirety, the Court concludes it does not so "obviously contradict[]" Plaintiff's version of events that her account must be disregarded in favor of the video or Defendants' narrative.  *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (alteration added; citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  Nor does the available body-cam footage, which begins only after Plaintiff is already in handcuffs, fill in the gaps.  (*See* Notice, Ex. 8, USB Thumb Drive, Body-Cam Footage).

[10] The City has adopted the Officers' arguments.  (*See* City's Mot. 4 n.3).

events that precipitated the encounter; whether Plaintiff complied with police orders; and the extent of force used, and whether that force was justified.  (*Compare* City's SOF, *and* Officers' SOF, *with* Pl.'s Resp. City's SOF, *and* Pl.'s Resp. Officers' SOF).  These factual contests go to the heart of both section 1983 claims.  *See* Fed. R. Civ. P. 56(c); *see also Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1409 (S.D. Fla. 2014); *Carroll v. Santa Rosa Cnty.*, No. 18-cv-2382, 2021 WL 4526711, at *5 (N.D. Fla. Aug. 27, 2021), *report and recommendation adopted*, No. 18-cv-2382, 2021 WL 4523080 (N.D. Fla. Oct. 4, 2021).  As the material facts are disputed, the Court turns to whether the Officers are nevertheless entitled to summary judgment on their qualified immunity defense, using Plaintiff's version of the facts.  *See Robinson*, 415 F.3d at 1257.

As a threshold matter, the record confirms that both Officers were acting within the scope of their discretionary authority.  Llanes was in full uniform, issued police commands, drove a patrol car, and made an arrest — all while working an authorized off-duty security detail arranged through a contract between the OLPD and the Market.  (*See* Officers' SOF ¶¶ 2, 7, 22; Pl.'s Resp. Officers' SOF ¶¶ 2, 7, 22 (disputed as characterized); *see also* Notice, Ex. 1, Llanes Dep. [ECF No. 89-1] 41:17–42:8).  Courts have found similar conduct sufficient to satisfy the discretionary authority requirement, even where the officer is not on active duty.  *See Bouye v. Marshall*, 102 F. Supp. 2d 1357, 1362 (N.D. Ga. 2000) (finding that an off-duty officer was acting within his discretionary authority where he wore his uniform, displayed his badge, patrolled the premises, and used official authority to detain and search the plaintiff).  Taylor, for his part, was on duty, responded to a call for backup from a fellow officer, and assisted in making an arrest (*see* City's SOF ¶¶ 15, 18–20; Pl.'s Resp. City's SOF ¶¶ 15, 18–20 (all disputed on other grounds)) — conduct that plainly falls within the scope of discretionary authority, *see Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (holding that the defendant-officers "readily satisfied this requirement, as they undertook all the challenged actions while on duty as police officers conducting arrest and

investigative functions").

Because the Officers were acting within the scope of their discretionary authority, to prevent the grant of summary judgment, the burden shifts to Plaintiff to satisfy the two-part qualified immunity test: (1) to show the Officers violated a constitutional right; and (2) to demonstrate the unlawfulness of their conduct was clearly established at the time it occurred. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1200 (11th Cir. 2007) (citations omitted).  The two-part test is considered as to each section 1983 claim separately.

### 1. **False Arrest (Count I)**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV (alterations added).  "Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances."  *D.C. v. Wesby*, 583 U.S. 48, 56 (2018) (citation omitted).  As relevant here, "[a] warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence."  *Id.* (alteration added; citation omitted).  Probable cause, in turn, "exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish 'a probability or substantial chance of criminal activity.'"  *Washington v. Howard*, 25 F.4th 891, 898–99 (11th Cir. 2022) (quoting *Wesby*, 583 U.S. at 57).  Notably, "[p]robable cause does not require conclusive evidence and 'is not a high bar.'"  *Id.* at 899 (alteration added; quoting *Wesby*, 583 U.S. at 57).

"While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity."  *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007).  An officer is not automatically liable for making an arrest that, "when seen with the benefit of hindsight, turns out not to have been supported by probable cause."  *Id.*  Rather, in the section 1983 false arrest context, "an officer need not have

actual probable cause, but only 'arguable' probable cause" to be entitled to qualified immunity. *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (citation and quotation marks omitted). "[A]rguable probable cause exists where a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." *Edger v. McCabe*, 84 F.4th 1230, 1236–37 (11th Cir. 2023) (citation and quotation marks omitted).

The Eleventh Circuit has clarified that "the arguable probable cause inquiry in a false arrest case is no different from the clearly established law inquiry[.]" *Garcia*, 75 F.4th at 1187 (alteration added). In other words, if officers had arguable probable cause to arrest, "their violation of the law was not clearly established and vice-versa." *Edger*, 84 F.4th at 1236. This standard acknowledges "that law enforcement officers may make reasonable but mistaken judgments regarding probable cause[,]" but it "does not shield officers who *unreasonably* conclude that probable cause exists." *Skop*, 485 F.3d at 1137 (alteration added; emphasis in original).

Whether an officer had actual or arguable probable cause to arrest ultimately "depends on the elements of the alleged crime and the operative fact pattern." *Edger*, 84 F.4th at 1237 (citation and quotation marks omitted). "Probable cause for an arrest may be found if there is probable cause to believe any crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed." *Manners v. Cannella*, 891 F.3d 959, 969 (11th Cir. 2018) (citation omitted). Because probable cause is "a fluid concept" that "deals with probabilities[,]" it must be assessed based on "the totality of the circumstances[.]" *Wesby*, 583 U.S. at 57 (alterations added; citations and quotation marks omitted).

### a.  Constitutional Violation

As for the first qualified-immunity prong — which analyzes whether the Officers violated one of Plaintiff's constitutional rights — the Officers maintain they had actual probable cause to arrest Plaintiff under three misdemeanor provisions of the Florida Statutes: (1) section 316.2045,

for obstructing traffic; (2) section 877.03, for disorderly conduct; and (3) section 843.02, for resisting an officer without violence. (*See* City's Mot. 8–13; Officers' Mot. 4–7). As explained, if the Officers had probable cause to believe Plaintiff committed any of these offenses in their presence, that alone is enough to defeat Plaintiff's false arrest claim. *See Manners*, 891 F.3d at 969; *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). The Court addresses each of these offenses in turn, considering the disputed facts in the light most favorable to Plaintiff. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006) (citations omitted), *abrogated in part on other grounds by Pearson*, 555 U.S. 223.

### i. Obstructing Traffic

Defendants first argue that the Officers had probable cause to arrest Plaintiff for violating Florida Statute section 316.2045, which prohibits "willfully obstruct[ing] the free, convenient, and normal use of a public street, highway, or road by: [(1)] [i]mpeding, hindering, stifling, retarding, or restraining traffic or passage . . . ; [(2)] [s]tanding on or remaining in the street, highway, or road; or [(3)] [e]ndangering the safe movement of vehicles or pedestrians . . . ." Fla. Stat. §§ 316.2045(1)(a)(1)–(3) (alterations added); (*see also* City's Mot. 10, 13; Officers' Mot. 3–8). According to Defendants, Plaintiff violated the statute by stepping into the roadway outside the Market, approaching vehicles, and obstructing the flow of traffic. (*See* City's Mot. 13; Officers' Mot. 4–6). They insist this conduct not only impeded traffic but also created a safety risk by distracting or endangering passing motorists. (*See id.*).

As described, Plaintiff's and Defendants' accounts diverge. Plaintiff denies stepping into the street or flagging down moving vehicles; she says she stayed on the sidewalk, where some motorists voluntarily stopped and accepted flyers through their open car windows. (*See* Pl.'s Resp.

Officers' Mot. 8–9; *see also* Pl.'s Resp. Officers' SOF ¶¶ 6, 9).  Plaintiff states she never obstructed the free flow of traffic or created a hazard for motorists or pedestrians.  (*See* Pl.'s Resp. Officers' Mot. 11).  In Plaintiff's telling, the only "obstruction" was her mere presence on a public sidewalk. (*See id.*).

Viewing the record in the light most favorable to Plaintiff, the facts do not support a finding of probable cause to arrest her under section 316.2045 as a matter of law.  *Wesby*, 583 U.S. at 57 (citation omitted); *see also* Fla. Stat. § 316.2045(1)(a).  As noted, Plaintiff maintains that she never entered the street, flagged down cars, or otherwise impeded the flow of vehicles.  (*See* Pl.'s Resp. Officers' Mot. 8–9, 11).  The Officers offer a different sequence of events but, crucially, identify no additional evidence — such as video or third-party testimony — that clearly refutes her version. (*See generally* Officers' SOF).  Even accepting the possibility that traffic in the area slowed, the totality of the circumstances, on Plaintiff's telling, falls short of establishing a "substantial chance" that Plaintiff violated the statute.  *See Wade v. Doe*, No. 19-cv-00406, 2020 WL 7130791, at *9 (M.D. Ga. Dec. 4, 2020) ("Now, the Court is left with a classic 'he said, she said' kind of dispute — the kind that is wholly inappropriate for resolution at the summary judgment stage.").

ii.  <u>Disorderly Conduct</u>

The same is true of disorderly conduct under Florida Statute section 877.03, which criminalizes acts that "corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them[;]" as well as conduct that "constitute[s] a breach of the peace or disorderly conduct[.]"  Fla. Stat. § 877.03 (alterations added).  "Florida courts have narrowly interpreted the meaning of this [provision.]"  *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1116 (11th Cir. 2006) (alteration added; citation omitted).

Defendants contend that Plaintiff screamed, "[t]his is not Opa-Locka[,] this is my country!" in defiance of Llanes's orders to leave, and that this outburst disrupted the peace.  (City's Mot. 11

16

(alterations added; emphasis omitted); *see also* Officers' Mot. 4).  Plaintiff denies raising her voice, using threatening language, or causing any disturbance; rather, she describes a situation in which she calmly asked Llanes why she was being ordered to leave and voiced her disagreement without yelling or using profanity.  (*See* Pl.'s Resp. City's Mot. 6–7; Pl.'s Resp. Officers' Mot. 6–9).

At summary judgment, the Court need not adopt Plaintiff's version wholesale, but where the record contains nothing beyond Defendants' own characterizations of her behavior, the Court is obligated to credit her account if a reasonable jury could.  *See Haves*, 52 F.3d at 921 (citation omitted).  Here, there is no video, witness statement, or corroborating evidence that squarely contradicts Plaintiff's account and would create a record of undisputed material facts.  The Officers' narrative — standing alone — cannot carry the day, and the Court must resolve all reasonable inferences in Plaintiff's favor.

Even crediting Defendants' version of events, Plaintiff's purported isolated outburst — a single shouted phrase — does not, as a matter of law, rise to the level of disorderly conduct under Florida law.  "The verbal conduct which can support a conviction for disorderly conduct . . . has been severely curtailed by the Florida Supreme Court in order to prevent the statute from being found unconstitutionally over broad."  *Chandler v. State*, 744 So. 2d 1058, 1060 (Fla. 4th DCA 1999) (alteration added).  As it stands, "there are only two instances where words can amount to disorderly conduct: 'fighting words' and 'words like shouts of 'fire' in a crowded theatre.'"  *Id.* (quoting *State v. Saunders*, 339 So. 2d 641, 644 (Fla. 1976)).  While a jury might ultimately accept Defendants' characterization of the encounter, the Court cannot find — even accepting Defendants' version — that the conduct falls within that narrow statutory reach.

Defendants also describe Plaintiff's nonverbal behavior as problematic.  They say she lingered near the roadway, refused to leave despite repeated commands, and distracted drivers by handing out flyers to occupants of moving vehicles.  (*See* City's Mot. 11–13; Officers' Mot. 4–5).

17

They contend this conduct endangered the free flow of traffic and contributed to a public disturbance. (*See id.*).

Once more, Plaintiff tells a different story. She says she stayed on the sidewalk, moved her vehicle when instructed, and gave flyers only to drivers who stopped on their own. (*See* Pl.'s Resp. Officers' Mot. 8–9); *cf. Barry v. State*, 934 So. 2d 656 (Fla. 2d DCA 2006) (finding the evidence insufficient to support conviction for disorderly conduct where defendant yelled obscenities and shook his finger in a police officer's face, and the public confrontation slowed traffic). She further explains the traffic buildup had nothing to do with her; as vehicles attempting to enter the closed front gates to the Market had to stop, turn around, or back out into the street, occasionally causing cars to block the right lane or form a short line along the curb. (*See* Pl.'s Decl. ¶ 5). On her telling, then, Plaintiff denies obstructing traffic, defying orders, posing a hazard, or disturbing the peace. (*See* Pl.'s Resp. Officers' Mot. 8–9).

Viewing the evidence in the light most favorable to  Plaintiff — whose account reflects calm and unobtrusive engagement in a public space — the Court cannot find, as a matter of law, that a reasonable officer could have believed there was a substantial chance she "corrupt[ed] the public morals," "outrag[ed] the sense of public decency," or "constitute[d] a breach of the peace[.]" Fla. Stat. § 877.03 (alterations added). Plaintiff has carried her burden. Construed in her favor, the record does not support a finding that the Officers had probable cause to believe Plaintiff violated section 877.03 as a matter of law.

### iii.  Resisting an Officer

Defendants' reliance on Florida Statute section 843.02 fares no better. The statute prohibits nonviolent conduct that "resist[s], obstruct[s], or oppose[s]" an officer "in the lawful execution of any legal duty[.]" Fla. Stat. § 843.02 (alterations added).

Defendants argue that Plaintiff's failure to comply with Llanes's repeated commands to

leave the area — along with her purported conduct during the arrest — amounted to obstruction of the Officers' efforts to maintain public order and manage traffic flow. (*See* City's Mot. 9–11; Officers' Mot. 4–6). Plaintiff insists she complied with Llanes's order to move her vehicle; did not interfere with the Officers' duties; and repeatedly assured them, even mid-arrest, that she was not resisting. (*See* Pl.'s Resp. City's Mot. 4–5, 7–8; Pl.'s Resp. Officers' Mot. 9–10, 13–14).[11]

Resolving all factual disputes in Plaintiff's favor, the record does not support a finding, as a matter of law, that reasonable officers in the Officers' position could have concluded that Plaintiff "resist[ed], obstruct[ed], or oppose[d]" them in the lawful execution of any duty. Fla. Stat. § 843.02 (alterations added); *cf. J.G.D. v. State*, 724 So. 2d 711, 711–12 (Fla. 3d DCA 1999) (finding that nonviolent refusal to leave, even when voicing loud protests, did not support disorderly conduct or resisting arrest charge).[12]

### b. Clearly Established Law

Having determined that the record does not support a finding of probable cause as a matter of law under Plaintiff's version of events, the next question is whether the Officers nonetheless acted within the bounds of clearly established law — or, put differently, whether they had at least *arguable* probable cause. *See Tolston v. City of Atlanta*, 723 F. Supp. 3d 1263, 1307 (N.D. Ga. 2024) (citing *Garcia*, 75 F.4th at 1187). An official violates clearly established law when "'the contours of the right are sufficiently clear that every reasonable official would have understood

---

[11] Plaintiff also questions whether the Officers were lawfully executing a legal duty — pointing to Llanes's off-duty status and Taylor's lack of firsthand observations. (*See* Pl.'s Resp. Officers' Mot. 4, 13–14). The Court need not reach that issue. Viewing the record in the light most favorable to Plaintiff, there is no basis to conclude that she resisted, obstructed, or opposed the Officers in any way that would support probable cause for arrest.

[12] The Officers attempt to rely on the "fellow-officer rule," insisting the information Llanes relied on to determine probable cause to arrest Plaintiff can be imputed to Taylor. (*See* Officers' Reply 6 (citation omitted)). That rule does not apply if the fellow officer, herself, lacks probable cause. *See Yessin v. City of Tampa*, 613 F. App'x 906, 907 (11th Cir. 2015) (citing *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 & n.5 (11th Cir. 2004)).

that what he is doing violates that right.'" *Echols v. Lawton*, 913 F.3d 1313, 1323 (11th Cir. 2019)

(alteration adopted; quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

In the false arrest context, "the dispositive question is whether it was already clearly

established, as a matter of law, that at the time of Plaintiff's arrest, an objective officer could not

have concluded reasonably that probable cause existed to arrest Plaintiff under the particular

circumstances Defendants confronted." *Garcia*, 75 F.4th at 1186 (citation and quotation marks

omitted).   Qualified immunity may shield officers from suit, "but only up to the line defined by

the arguable probable cause standard[.]" *Skop*, 485 F.3d at 1144 (alteration added; citation

omitted).   And "'[w]here the resolution of disputed critical facts determines on which side of this

line the officer's conduct fell, summary judgment is inappropriate.'" *Tolston*, 723 F. Supp. 3d at

1308 (alteration adopted; other alteration added; quoting *Skop*, 485 F.3d at 1143).

To show that this constitutional line was clearly established, Plaintiff may identify (1) a

materially similar case decided by the Supreme Court, the Eleventh Circuit, or the Florida Supreme

Court; (2) a broad legal principle that applies with obvious clarity to the facts at hand; or (3)

conduct so egregious that any reasonable officer would have known it was unlawful even without

prior case law.   *See Gaines v. Wardynski*, 871 F.3d 1203, 1208–09 (11th Cir. 2017) (citations

omitted); *see also al-Kidd*, 563 U.S. at 741 (citations omitted).   Plaintiff proceeds under the first

method and identifies materially similar precedent that forecloses qualified immunity.

Specifically, Plaintiff relies on *Williamson v. Mills*, 65 F.3d 155 (11th Cir. 1995), for the

proposition that no reasonable officer could have believed probable cause existed to arrest her

under the circumstances then present.[13]   (*See* Pl.'s Resp. Officers' Mot. 6–7).   The Court agrees

---

[13] Plaintiff also cites decisions from federal district courts and Florida's intermediate appellate courts, along
with unpublished Eleventh Circuit opinions.   (*See* Pl.'s Resp. Officers' Mot. 5–17).   Those authorities
cannot clearly establish the law for qualified immunity purposes; that standard is met only by precedent
from the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court.   *See Gaines*, 871 F.3d at 1208
(citation omitted); *Charles v. Johnson*, 18 F.4th 686, 698 (11th Cir. 2021) (citations omitted).

that *Williamson* is instructive.  There, the Eleventh Circuit reversed a district court's finding of qualified immunity where an officer arrested a man for photographing law enforcement at a public event without any evidence linking him to a crime, emphasizing that "[t]aking photographs at a public event is a facially innocent act."  *Williamson*, 65 F.3d at 158 (alteration added).

So too, here.  Under Plaintiff's version of events, Plaintiff was engaged in facially lawful conduct: initially speaking with passersby while standing on a public sidewalk and later calling 911 to report police harassment.  (*See* Pl.'s Resp. Officers' SOF ¶¶ 6, 21–24).  She did not obstruct traffic, stand in the road, or wave down any vehicles.  (*See id.*).  Plaintiff further recounts that the Officers never told her she was under arrest, she assured Llanes she would not resist, and she pleaded not to be tased because of a heart condition.  (*See id.* ¶¶ 29, 31, 39; Notice, Ex. 6, Plaintiff Dep. [ECF No. 89-6] 114:5–11).

As in *Williamson*, and crediting Plaintiff's account, Plaintiff's arrest followed non-criminal, non-threatening conduct that lacked any identifiable link to unlawful activity.  *See* 65 F.3d at 156–58.  That case makes clear that arresting someone engaged in facially innocent, non-disruptive behavior crosses the constitutional line.  Because Plaintiff's version of events — disputed only by the Officers' statements — reflects precisely that, the Officers are not entitled to summary judgment on their qualified immunity defense.  Summary judgment on Count I is therefore denied.

CASE NO. 24-22076-CIV-ALTONAGA/Reid

## 2. **Excessive Force (Count II)**[14]

Plaintiff also contends that the Officers used excessive force in violation of the Fourth Amendment. (*See* SAC ¶¶ 41–44). According to Plaintiff, while she stood on the sidewalk calling 911, both Officers pinned her against Taylor's patrol car. (*See* Pl.'s Resp. Officers' SOF ¶¶ 24, 30, 43). Plaintiff states she made clear she was not resisting and warned that she had a heart condition; despite this, Llanes nonetheless deployed her taser, striking Plaintiff in the back. (*See id.* ¶ 31; *see also id.* ¶¶ 29–30). Plaintiff further asserts that Llanes threw her to the ground and tased her a second time while she lay still on the pavement. (*See* Pl.'s Resp. Officers' SOF ¶ 36; *see also* Pl.'s Resp. Officers' Mot. 2, 4). Plaintiff asserts the Officers' actions caused both physical and psychological injury. (*See* SAC ¶¶ 47–48; Pl.'s Resp. Officers' Mot. 2–4).

A claim of excessive force during an arrest is governed by the Fourth Amendment's guarantee against unreasonable seizures. *See Barnes v. Felix*, No. 23-1239, 2025 WL 1401083, at *4 (U.S. May 15, 2025) (citations omitted). "The touchstone of the Fourth Amendment is 'reasonableness,' as measured in objective terms." *Id.* (citation and quotation marks omitted); *see also Graham v. Connor*, 490 U.S. 386, 395–96 (1989) (citation omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted).

---

[14] Defendants argue that Plaintiff's excessive force claim (Count II) and assault and battery claim (Count III) are subsumed by her false arrest claim because, in their view, the force the Officers used was unreasonable only if there was an absence of probable cause. (*See* Defs.' Mot. 16–17). This mischaracterizes Counts II and III. While the Eleventh Circuit recognizes that an "artificial" excessive force claim — one alleging that a use of force was excessive only because the arrest itself was unlawful — may be subsumed by a false arrest claim, a "genuine" excessive force claim challenges how the arrest was carried out and must be analyzed independently, even if probable cause existed. *Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022) (citations omitted); *see also Detris v. Coats*, 523 F. App'x 612, 617 (11th Cir. 2013) (explaining that section 1983 excessive force claims and state-law battery claims are analyzed under the same standard). Plaintiff's claims are "genuine" because they focus on the Officers' specific conduct — pinning her against a car and tasing her twice despite her non-resistance (*see* SAC ¶¶ 23–27; Pl.'s Resp. Officers' SOF ¶¶ 30–33) — which raises a separate Fourth Amendment question about whether the force was reasonable.

In considering a motion for summary judgment, the Court must "reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017) (citation and quotation marks omitted).

The objective reasonableness standard requires that courts carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citation and quotation marks omitted). Under this standard, "[a]n officer will be entitled to qualified immunity if his actions were 'objectively reasonable' — that is, if a reasonable officer in the same situation would have believed that the force used was not excessive." *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (alteration added; citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The reasonableness of the force used depends on "the facts and circumstances of each particular case[.]" *Davis*, 451 F.3d at 767 (alteration added; citation and quotation marks omitted).

An officer making a lawful arrest is permitted to use some degree of physical force or the threat of it to complete the detention. *See Patel v. City of Madison*, 959 F.3d 1330, 1339 (11th Cir. 2020) (citation omitted). The tools used here — a takedown and taser — are not categorically unconstitutional. *See Charles v. Johnson*, 18 F.4th 686, 699, 701 (11th Cir. 2021). To determine whether the force used crossed the constitutional line, courts ordinarily look to six factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; (3) whether the suspect was actively resisting or attempting to evade arrest; (4) the need for the application of force; (5) the relationship between that need and the amount of force used; and (6) the extent of the injury inflicted. *See Graham*, 490 U.S. at 390, 396 (citations omitted); *Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014) (citations omitted).

Yet, "in a case where an officer uses gratuitous and excessive force against a suspect who

is under control, not resisting, and obeying commands, [the Eleventh Circuit has] repeatedly ruled that the officer violates the Fourth Amendment and is denied qualified immunity." *Patel*, 959 F.3d at 1339 (alteration added; citations and quotation marks omitted); *see also Stephens*, 852 F.3d at 1326 (vacating grant of qualified immunity on summary judgment where "forceful chest blows" and "throwing [plaintiff] against the car-door jamb" were "unnecessary for a compliant, nonaggressive arrestee"); *Lee*, 284 F.3d at 1198  (finding excessive force where officer slammed handcuffed plaintiff's head onto car hood despite her posing no threat or flight risk); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (holding force excessive where officers kicked handcuffed, non-resisting plaintiff in the ribs and struck his head on the pavement).

### a.   Constitutional Violation

The Officers maintain that their use of force was necessary to restrain an actively resisting subject who refused to obey their commands.  (*See* Officers' Mot. 8–10; Officers' Reply 9–10). Plaintiff denies resisting.  (*See* Pl.'s Resp. City's Mot. 4–5).  Because the Court views the evidence in the light most favorable to Plaintiff, *see Haves*, 52 F.3d at 921, the Court cannot find, as a matter of law, that the Officers' takedown and taser deployments were neither gratuitous nor excessive.

On Plaintiff's account, she was standing in a public area and calling 911 when Llanes approached.  (*See* Pl.'s Resp. Officers' SOF ¶¶ 6, 21–24, 29).  Plaintiff states she had already moved her vehicle as instructed, made no threatening gestures, and assured Llanes she would not resist.  (*See* Pl.'s Resp. City's SOF ¶¶ 5, 9; Pl.'s Resp. Officers' SOF ¶¶ 24, 29).

Even so, both Officers pinned Plaintiff against Taylor's patrol car.  (*See* Pl.'s Resp. Officers' SOF ¶¶ 30, 43).  Llanes then tased her once while she was standing, and again after she had fallen to the pavement. (*See* Officers' SOF ¶¶ 31, 35; Pl.'s Resp. Officers' SOF ¶¶ 31 (disputed on other grounds), 36 (disputed on other grounds); SAC ¶ 25).  Neither Officer, Plaintiff contends, told her she was under arrest or ordered her to stop resisting before the takedown or taser

deployments.  (*See* Pl.'s Resp. Officers' SOF ¶¶ 24, 29, 31).  She also maintains she never tried to flee or threatened anyone — a point Defendants do not appear to dispute.  (*See* Pl.'s Resp. City's SOF ¶ 41; Pl.'s Resp. Officers' SOF ¶¶ 31, 33; Pl.'s Resp. City's Mot. 4; Pl.'s Resp. Officers' Mot. 14; *see also generally* City's SOF; Officers' SOF; City's Reply SOF; Officers' Reply SOF).

Accepting Plaintiff's version as true, the Officers' use of force — in response to perceived nonviolent misdemeanors and absent any apparent threat or resistance by Plaintiff — could reasonably be viewed as excessive and unjustified under clearly established Fourth Amendment law.[15]

### b. Clearly Established Law

The Court must next consider whether clearly established law as of October 2022 — when the arrest occurred — would have put the Officers on notice that their use of force was unconstitutional.  *See Tolston*, 723 F. Supp. 3d at 1313.  As previously explained, to demonstrate that the law was clearly established, a plaintiff must either point to "a materially similar case," identify "a broader, clearly established principle," or show that the conduct "so obviously violate[d] the Constitution that prior case law is unnecessary."  *Terrell v. Smith*, 668 F.3d 1244, 1255–56 (11th Cir. 2012) (alteration added; citation and quotation marks omitted).

Plaintiff argues that Llanes used excessive force "because [Plaintiff] did not resist by word or act, and because [Llanes] had no probable cause to arrest her to begin with."  (Pl.'s Resp. City's

---

[15] Even if the Court applied the six-factor framework, the result would be the same.  *See Graham*, 490 U.S. at 396; *Saunders*, 766 F.3d at 1267.  The offenses — obstructing traffic, disorderly conduct, and resisting without violence — are all misdemeanors, for which less force is typically appropriate.  *See Richmond v. Badia*, 47 F.4th 1172, 1183 (11th Cir. 2022) (citation omitted).  And Plaintiff claims she made no threats, was not resisting, and warned the Officers about a heart condition before Llanes tased her and they threw Plaintiff down.  (*See* Pl.'s Resp. City's SOF ¶ 9; Pl.'s Resp. Officers' SOF ¶¶ 6, 21–24, 29).  She further alleges physical and psychological injury requiring hospital transport.  (*See* SAC ¶ 28).  When credited, her account supports a finding that the force used — particularly Llanes's taser deployment while Plaintiff lay prone — was grossly disproportionate and unnecessary.  *See Saunders*, 766 F.3d at 1269–70.

Mot. 3 (alterations added)).[16]   She states when Llanes told her she was under arrest, she responded

that "she would not resist and asked her not to tase her because she had a heart condition[;]" yet

Llanes tased her "not once but twice."   (*Id.* (alteration added)).   Although Plaintiff cites no

materially similar precedent in her briefing (*see generally* Pl.'s Resp. City's Mot.; Pl.'s Resp.

Officers' Mot.), she has pointed to a broader, clearly established principle that controls here, *see*

*Ingram v. Kubik*, 30 F.4th 1241, 1252 (11th Cir. 2022) (citation omitted).

By 2022, it was clearly established that the "'gratuitous use of force when a criminal

suspect is not resisting arrest constitutes excessive force.'"   *Id.* (quoting *Hadley v. Gutierrez*, 526

F.3d 1324, 1330 (11th Cir. 2008); other citations omitted).   The Eleventh Circuit had made clear

that officers may not use physical force against individuals who pose no threat, offer no resistance,

and attempt no flight.   *See Perez*, 809 F.3d at 1222 (citations omitted); *Saunders*, 766 F.3d at

1265.[17]

Viewing the record in the light most favorable to Plaintiff — who explains she stood calmly

on a public sidewalk, tried to call 911, and assured Llanes she would not resist arrest (*see* Pl.'s

---

[16] Although Plaintiff presents this excessive force argument in support of her state-law assault and battery claim (*see* Pl.'s Resp. City's Mot. 3), the Court considers it for the section 1983 excessive force claim as well, since the same conduct forms the basis for all claims (*see* SAC ¶¶ 40–56).   Indeed, excessive force claims under Florida law and section 1983 often rise and fall together.   *See Henry v. City of Mt. Dora*, No. 13-cv-528, 2014 WL 5823229, at *13 n.24 (M.D. Fla. Nov. 10, 2014), *aff'd*, 688 F. App'x 842 (11th Cir. 2017).

[17] While *Hadley*, *Perez*, and *Saunders* involved force applied to suspects who were already handcuffed, "in 2017, the Eleventh Circuit explained that 'the same rationale applies to the use of gratuitous force when the excessive force is applied prior to the handcuffing.'"   *Tolston*, 723 F. Supp. 3d at 1313 (alteration adopted; quoting *Stephens v. DeGiovanni*, 852 F.3d 1298, 1326 n.33 (11th Cir. 2017)).   And in the years following *Stephens* — but still before Plaintiff's arrest — the Eleventh Circuit consistently held that officers were not entitled to qualified immunity where they "unnecessarily thr[ew] non-resisting, unhandcuffed suspects on the ground."   *Richmond v. Badia*, 47 F.4th 1172, 1184 (11th Cir. 2022) (alteration added; citing *Ingram v. Kubik*, 30 F.4th 1241, 1254 (11th Cir. 2022); *Patel v. City of Madison*, 959 F.3d 1330, 1343 (11th Cir. 2020)).   The same holds true for taser deployments; law enforcement may use them to subdue violent or belligerent suspects, but not on compliant individuals posing no threat.   *See Oliver v. Fiorino*, 586 F.3d 898, 907–08 (11th Cir. 2009); *see also Fils v. City of Aventura*, 647 F.3d 1272, 1290 (11th Cir. 2011).

Resp. Officers' SOF ¶¶ 22–24, 29) — the Court cannot conclude, as a matter of law, that a reasonable officer in the Officers' position would have believed the use of force was lawful. Plaintiff insists she posed no threat; made no aggressive movements; never attempted to flee; and was suspected, at best, of nonviolent misdemeanor offenses. (*See id.* ¶¶ 29, 45). Given these facts, as Plaintiff tells them, and the governing legal principles, clearly established law at the time would have provided fair warning that the use of force was unconstitutional. The Officers are therefore not entitled to summary judgment on their qualified immunity defense to Count II.

### B. **Assault & Battery (Counts III & VI); False Imprisonment (Counts IV & VII)**

Plaintiff also brings claims for assault and battery and false imprisonment against the Officers and seeks to hold the City vicariously liable. (*See* SAC ¶¶ 50–62, 82–94). The Court addresses each in turn.

### 1. **Assault and Battery (Counts III and IV)**

In Counts III and VI, Plaintiff brings assault-and-battery claims against the Officers and the City, stating that Llanes and Taylor intentionally subjected her to harmful and offensive contact — including being pinned to a car, tased, and thrown to the ground — while acting within the scope of their employment. (*See id.* ¶¶ 51–56, 83–89). She seeks to hold the City vicariously liable under Florida Statute section 768.28(9). (*See* SAC ¶¶ 51–56, 83–89).

Defendants contend these claims fail as a matter of law because the arrest was lawful, and the force used was both reasonable and necessary to secure compliance. (*See* City's Mot. 4–7; Officers' Mot. 13–14). They also argue that Taylor bears no liability, as he did not personally taser or strike Plaintiff. (*See* Officers' Mot. 11). Plaintiff maintains that no force was warranted at all, as she was lawfully standing on a public sidewalk, presented no threat, and offered no resistance; and Taylor actively participated in restraining her during the encounter. (*See* SAC ¶¶ 24–25; Pl.'s Resp. City's Mot. 3–4; Pl.'s Resp. Officers' Mot. 5–14).

Under Florida law, a battery requires proof that the defendant intentionally caused harmful or offensive contact with the plaintiff. *See City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) (citing Restatement (Second) of Torts § 18 (1965)). Law enforcement officers enjoy a "presumption of good faith" when using force to effectuate a lawful arrest, but that presumption no longer applies if the force is "clearly excessive." *Sanders*, 672 So. 2d at 47 (citations omitted). Once that line is crossed, they may be liable for battery. *See id.* (citation omitted). A battery claim of excessive force thus hinges on whether the force applied was "reasonable under the circumstances." *Id.* (citations omitted). Officers have a complete defense to such a claim if they reasonably believed the force was necessary to defend themselves or another from bodily harm. *See id.* (citing Fla. Stat. § 776.05(1)).

Notably, "a claim for assault and battery premised upon the use of excessive force is essentially the state-law counterpart to a [section] 1983 excessive force claim." *Henry v. City of Mt. Dora*, No. 13-cv-528, 2014 WL 5823229, at *13 n.24 (M.D. Fla. Nov. 10, 2014) (alteration added), *aff'd*, 688 F. App'x 842 (11th Cir. 2017); *see also Baxter v. Santiago-Miranda*, 121 F.4th 873, 891–92 (11th Cir. 2024) (observing that the Eleventh Circuit "has applied the same Fourth Amendment excessive force analysis to a battery claim against an officer under Florida law" (citation omitted)). Of course, the federal doctrine of qualified immunity has no application to state-law claims. *See Atheists of Fla., Inc. v. City of Lakeland*, 779 F. Supp. 2d 1330, 1342 (M.D. Fla. 2011). Thus, the Court returns to the traditional summary judgment standard, under which genuine disputes of material fact, alone, are sufficient to defeat summary judgment. *See Fed. R. Civ. P. 56(a).

That standard is easily met here. Plaintiff recounts that she stood calmly on a public sidewalk, posed no threat to anyone, and told Llanes she would not resist and had a heart condition; despite this, Llanes tased her twice. (*See* Pl.'s Resp. Officers' SOF ¶¶ 24, 29, 31, 39). Plaintiff

also contends that Taylor helped pin her to a car and force her to the ground. (*See id.* ¶¶ 34–35). If a jury credits Plaintiff's account, it could reasonably find that the Officers' use of force was "clearly excessive" under Florida law. *See Sanders*, 672 So. 2d at 47.

Because the record contains contested accounts of what occurred and the degree of force used, summary judgment is inappropriate on the assault and battery claims. And since Plaintiff's claims against the Officers survive summary judgment, so, too, do her derivative claims against the City. *See Guerrero v. City of Coral Gables*, No. 21-cv-21122, 2022 WL 3154181, at *9 (S.D. Fla. Aug. 8, 2022) (noting that the viability of a vicarious liability claim against a city depends on the viability of the underlying tort claim against the officers).

### 2.  False Imprisonment (Counts IV & VII)

In Counts IV and VII, Plaintiff claims the Officers unlawfully detained her without a warrant, reasonable suspicion, or probable cause while acting within the scope of their employment. (*See* SAC ¶¶ 58–61, 91–94). She seeks to hold the City vicariously liable under Florida Statute section 768.28(9), asserting the Officers acted intentionally. (*See id.*).

Under Florida law, false arrest and false imprisonment are simply two names for the same tort. *See Benoit v. City of Lake City*, 343 F. Supp. 3d 1219, 1229 n.15 (M.D. Fla. 2018) (citations omitted). And "[a] false arrest claim under [section] 1983 is substantially the same as a claim for false arrest under Florida law." *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1409 (S.D. Fla. 2014) (alterations added). To prevail on a Florida-law false arrest claim, a plaintiff must prove three things: "(1) an unlawful detention and de[p]rivation of liberty against the plaintiff's will; (2) an unreasonable detention not warranted by the circumstances[;] and (3) an intentional detention." *Id.* (alterations added; citation omitted).

An officer may claim she had "probable cause" to arrest as an affirmative defense to a Florida-law false arrest claim. *See Lozman*, 39 F. Supp. 3d at 1409 (citation omitted). Probable

cause exists "'if at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *Id.* (quoting *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003)). Courts must assess probable cause "from the viewpoint of a prudent, cautious police officer on the scene at the time of the arrest" and not through the lens of hindsight. *Id.* (citing *Miami-Dade Cnty. v. Asad*, 78 So. 3d 660, 668 (Fla. 3d DCA 2012)). The test is an objective one: "whether the objective facts available to the officer at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed." *Id.* (citing *United States v. Gonzalez*, 969 F.2d 999, 1003 (11th Cir. 1992)).

Defendants argue Llanes had probable cause to arrest Plaintiff for various offenses under Florida law, and so these claims fail as a matter of law. (*See* City's Mot. 9–14; Officers' Mot. 2–6). In their well-worn argument, Defendants insist Plaintiff's refusal to obey lawful commands, obstruction of traffic, and resistance during the arrest provided ample probable cause. (*See* City's Mot. 9–14; Officers' Mot. 2–6). At this point, we are quite familiar with the different version Plaintiff presents. (*See* Pl.'s Resp. City's Mot. 6–8; Pl.'s Resp. Officers' Mot. 5–10).

Viewing the record in Plaintiff's favor, she was lawfully standing on a public sidewalk, complied with police instructions, and posed no threat when the Officers arrested her without warning. (*See* Pl.'s Resp. Officers' SOF ¶¶ 21–24, 29–31). Given the disputed material facts, the Court cannot conclude, as a matter of law, that probable cause supported Plaintiff's arrest for obstruction, disorderly conduct, or resisting arrest without violence. *See, e.g.*, *Robbins v. City of Miami Beach*, 613 So. 2d 580, 581 (Fla. 3d DCA 1993). Because probable cause is a complete defense to false arrest under Florida law, and because the presence or absence of probable cause turns on disputed facts, summary judgment must be denied. And since the City's liability under Count VII is derivative of the Officers' liability (*see* SAC ¶ 94), the same factual disputes that

CASE NO. 24-22076-CIV-ALTONAGA/Reid

preclude summary judgment for the Officers likewise preclude summary judgment for the City, *see Hesed-El v. Aldridge Pite, LLP*, No. 119-cv-162, 2020 WL 3163645, at *9 (S.D. Ga. June 12, 2020) (observing that "[u]nder the doctrine of *respondeat superior*, an employer's liability is purely derivative of its employee's liability[.]" (alterations added; citation and quotation marks omitted) *aff'd*, No. 20-14782, 2021 WL 5504969 (11th Cir. Nov. 24, 2021)).[18]

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant, City of Opa-Locka's Motion for Summary Judgment **[ECF No. 73]**, and Defendants, Johane Taylor and Gabriela Llanes's Motion for Summary Judgment **[ECF No. 77]** are **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 25th day of June, 2025.

_____

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

---

[18] Defendants also argue that statutory immunity under Florida Statute section 768.28(9)(a) bars Plaintiff's state-law claims. (*See* Officers' Mot. 14–16). That provision shields public employees from personal liability for actions within the scope of their employment unless they acted "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). "Bad faith" requires proof of actual malice — that is, "ill will, hatred, spite, or an evil intent." *Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020) (alteration adopted; citing *Eiras v. Florida*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017)).

Plaintiff's account — that she committed no crime, posed no threat, did not resist, and was nonetheless slammed against a car and tased twice (*see* Pl.'s Resp. Officers' SOF ¶¶ 22–24, 29–31) — could, if believed, permit a jury to find the Officers acted with wanton disregard or improper motive, *see Thompson v. Douds*, 852 So. 2d 299, 309 (Fla. 2d DCA 2003) (holding that evidence of officers' excessive force could indicate wanton and willful disregard, precluding summary judgment on statutory immunity grounds).